# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

LYNCH & CO. FUNERAL DIRECTORS, PLLC,
et al.,

        Plaintiffs,

                                      Case No. 08-CV-13949-DT

v.

FUNERAL ETHICS ORGANIZATION, INC., et al.,

        Defendants.
                                      /

## OPINION AND ORDER GRANTING DEFENDANTS'
## MOTIONS FOR SUMMARY JUDGMENT

Before the court are three motions for summary judgment: a June 1, 2009, motion filed by Defendant Funeral Ethics Organization ("FEO"), a June 26, 2009 motion filed by Defendant Lisa Carlson, and a June 30, 2009 motion filed by Funeral Consumers Alliance ("FCA"). The motions have been fully briefed and the court concludes a hearing is not necessary. *See* E.D. Mich. LR 7.1(e)(2). For the reasons stated below, the court will grant the motions.

### I. FACTUAL BACKGROUND

Plaintiff Thomas Lynch is a mortician, author, and poet. He and his son, Michael, are the only two members of Plaintiff Lynch & Co. Funeral Directors, PLLC ("Lynch & Co."). (Lynch Dep. at 18, FEO's Mot. Ex. F.) Lynch & Co. Operates a funeral home in Milford, Michigan, providing "after-life service" to residents in and around the Village of Milford. (Pls.' FEO Resp. Br. at iv.)

Since at least July 1998, Lynch has been involved in disagreements with Defendant Lisa Carlson over funeral and after-life issues. According to Plaintiffs, Defendants FCA and FEO are primarily involved in the "harassment" of the Lynches due to Carlson's roles at the two organizations. (Pls.' FCA Resp. at iv, v.) She held the position of Executive Director of Defendant FCA until she became the Executive Director and Editor of FEO. (*Id.* at v.) However, Plaintiffs contend that Carlson has continued her involvement in both organizations and that both organizations are intertwined with one another. (*Id.*) The first record of the acrimony between the parties appears in a 1998 article in the Oakland Press, entitled "Area Funeral Director's Novel Sparks Dispute." (Pls.' FEO Resp. Ex. C.) Referring to Lynch, Carlson is quoted as saying "[t]he guy's a snake," and "his words will come back to haunt him in writing." (*Id.*)[1]

According to Plaintiffs, shortly after the Oakland Press article appeared, Lisa Carlson self published her book, *Caring for the Dead: Your Final Act of Love*, in which she references Lynch. (Pls.' FEO Resp. v.) In her book, she claims that Lynch misled the public in his book, *The Undertaking,* as to the need for body donations in medical schools. (*Id.* at Ex. D.) She quoted Lynch as stating that "the supply of cadavers for medical and dental schools in this land of plenty was shamefully but abundantly

---

[1]Plaintiffs do not base their defamation action on this statement, but utilize it in an attempt to show malice by Defendants.

provided for," and then she queried "How many has he plied with this lie so the business could enjoy yet another 'good year'?"  (*Id.*)[2]

In 2007, PBS aired a documentary based on Lynch's book, *The Undertaking*. The video jacket describes the documentary as follows:

> FRONTLINE enters the world of Thomas Lynch, a poet and undertaker whose family has cared for the dead–and the living–in a small Michigan town for three generations.  For the first time, Lynch and his family allowed cameras inside Lynch & Sons giving behind-the-scenes access–from funeral arrangements to the embalming room—to the Lynches' world.  Through the intimate stories of families coming to terms with grief, mortality, and a funeral's rituals, THE UNDERTAKING illuminates the heartbreak and beauty inherent in the journey taken between life and death.

(Pls.' FEO Resp. Ex. E.)

On November 9, 2007, Lisa Carlson, Executive Director of FEO, disseminated a review, in email form, of *The Undertaking* to various sources, including PBS Frontline. (Pls.' FEO Resp. Ex. F.)  In the review, Carlson states, in part:

> In today's world . . . the purchase of a funeral is also a business transaction, in which the interests of consumers are protected by the Federal Trade Commission's (FTC) Funeral Rule.  In the program, the Lynches appear to have ignored the Rule, breaking the law in their dealings with at least three families.  Was Anna Dugan ever given a casket price list showing the range of costs before going into the casket show room, or was that piece of paper Sean Lynch kept in his hands as he deftly escorted her to a Newpointe Stainless Steel casket at a price of $1,000 higher than that selected for the average U.S. funeral?
>
> There was nothing visible on the laps of the Verrinos or on Tom Lynch's desk in front of them that was likely a General Price List (GPL) of all the funeral options from which they could choose for baby Anthony, even though such a list is a basic requirement of the FTC Rule at the state of

---

[2]Plaintiffs do not base their defamation action on this statement, but cite it, as with the previous statement, as an example of the long-standing disagreement between the parties.

>any funeral discussion.  Was this because the Lynches will give away this funeral, as many funeral directors do for infants?  We weren't told.

(*Id.*)  Plaintiffs contends in their complaint that the offensive statement, "[i]n the program, the Lynches appear to have ignored the Rule, breaking the law in their dealings with at least three families," was also quoted in the Fall 2007 FCAI Newsletter." (Compl. ¶ 17; *see also* Pl.'s Carlson Resp. at 1, citing Ex. A.)  The court's review of the cited Exhibit, however, does not reveal the quoted sentence.

In its Spring-Summer Newsletter of 2008, the FEO published an article entitled "Black Eye for Green Burial Council," in which Carlson writes, "Listed in Michigan, too, are six Lynch funeral homes.  The Lynches have been vocal against families caring for their own dead, even though Michigan has an excellent home burial statute, the ideal low-cost 'green' option, if one didn't have to use a funeral director, too."  ('s FEO Resp. Ex. H.)

Lynch avers that neither he nor Lynch & Co. has" vocalized any opposition to a family or an individual's rights to care for their own dead within the applicable federal, state and local laws."  (Lynch Aff. at ¶ 7., Pls.' FEO Resp. Ex. A.)  He further states that he has never been "involved in any public debate or controversy involving green burials, or allowing or disallowing families caring for their own dead." (*Id.* at ¶ 5.)  Thus, after the publication of the 2008 Newsletter, Lynch contacted FEO and demanded a retraction.  In response, Carlson, as editor of the FEO Newsletter, posted a comment to its website quoting the challenged statement (regarding the Lynches being vocal against families caring for their dead) and retracting the statement.  She continued, however, by stating that "[s]everal of the Lynches appear to be concerned that there is a

4

growing consumer effort to change the Michigan laws that require a funeral director to file the death certificate and oversee final disposition" and that "Tom Lynch has stated to me personally that he will lobby against such a change in the laws, change that would allow families to care for their own dead without a funeral director." (Pls.' FEO Resp. Ex. J.)

Further, Defendant FCA has posted on its website a power point presentation entitled "Deconstructing Thomas Lynch." (Pls.' FCA Resp. Ex. J.) The presentation includes the following statement, which Plaintiffs alleged is libelous: "Lynch suggests only two alternatives: 1. Cremation, which quickly disposes of the body by fire, followed by a memorial service, or 2. A funeral, at which the body must be displayed in the way funeral directors prefer." (*Id.*) The presentation concludes with a statement which Plaintiffs contend exhibit Defendants intent: "If we throw out Tom's 'baby' with the baptism water, it will cost him money, and that's what caused Tom to go wrong." (*Id.*)

## II. PROCEDURAL BACKGROUND

On September 12, 2008, Plaintiffs Thomas Lynch and Lynch & Co. filed a four-count complaint against Lisa Carlson, FCA, Funeral Consumers Alliance of Idaho ("FCAI"), and FEO. (Compl.) On July 3, 2009, FCAI was voluntarily dismissed. (7/03/09 Notice of Dismissal.) Count I alleges defamation per se against Defendant Carlson. (Pls.' Comp. ¶ 25.) Count I is based on the following st atement: "In the program, the Lynches appear to have ignored the Rule breaking the law in the their dealings with at least three families." (Pls.' Comp. ¶ 17.)[3] Plaintiffs

---

[3]Plaintiffs allege that the statement was published in FCAI's Fall 2007 Newsletter, however, it does not appear in the exhibit submitted to the court. This discrepancy is

5

contend the statement constitutes defamation per se because it purportedly states that Plaintiffs are guilty of criminal activity.

Count II alleges defamation against defendant FCA. Count II alleges that the presentation "Deconstructing Thomas Lynch: Why good guys sometimes go wrong", available at www.funerals.org, falsely states that: "Lynch only suggests two alternatives: (1) Cremation, which quickly disposes of the body by fire, followed by a memorial service or (2) A funeral, at which the body must be displayed in the way funeral directors prefer." (Pls.' Comp. ¶¶ 14, 15.)

Count III alleges defamation against defendants Carlson and FEO. Count III alleges that the following statement, published in FEO's Spring-Summer Newsletter 2008 and available online at www.funeralethics.org, is defamatory: "Listed in Michigan, too, are six Lynch funeral homes. The Lynches have been vocal against families caring for their own dead, even though Michigan has an excellent burial statute, the ideal low-cost 'green' option, if one didn't have to use a funeral director, too." *Id.* at ¶¶ 19-22.

Count IV alleges defamation per se against defendants Carlson, FEO, and FCA. Count IV alleges that Plaintiffs have suffered business losses from the defamatory statements noted in the other counts and that these damages are actionable as defamation per se as being injurious to their business reputation. (Pls.' Comp. ¶¶ 59, 64.)

---

not material to the court's analysis because the court finds the statement is not actionable even if Plaintiffs had submitted proof of its publication. As discussed below, Plaintiffs have failed to show actual malice as to this statement and, indeed, as to every statement cited by them as defamatory.

6

## IV.  STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).  "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate."  *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

The court does not weigh the evidence to determine the truth of the matter, but rather, to determine if the evidence produced creates a genuine issue for trial.  *Sagan*, 342 F.3d at 497 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party must first show the absence of a genuine issue of material fact.  *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000) (citing *Celotex*, 477 U.S. at 323). The burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  He must put forth enough evidence to show that there exists a genuine issue to be decided at trial.  *Plant*, 212 F.3d at 934 (citing *Anderson*, 477 U.S. at 256).  Summary judgment is not appropriate

when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson*, 477 U.S. at 251-52 (1986). The existence of a factual dispute alone does not, however, defeat a properly supported motion for summary judgment – the disputed factual issue must be material. *See id.* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict – 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'" (alteration in original)(citation omitted)). A fact is "material" for purposes of summary judgment when proof of that fact would establish or refute an essential element of the claim or a defense advanced by either party. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citation omitted).

## IV.  DISCUSSION

Under Michigan law, a claim for defamation is comprised of four elements: "(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by publication." *Rouch v. Enquirer & News*, 487 N.W.2d 205, 211 (Mich. 1992).

Although the three remaining Defendants have filed separate motions for summary judgment, they all assert that the claims against them fail as a matter of law because Plaintiffs are limited public figures and they cannot show that Defendants acted with actual malice. The Supreme Court has held:

> Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures and those who hold governmental office may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth.

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974). "In *Gertz v. Robert Welch, Inc* . . . the Supreme Court addressed the limited public figure classification, stating that an individual who voluntarily injects himself or is drawn into a particular public controversy thereby becomes a public figure for a limited range of issues." *Hodgins Kennels, Inc. v. Durbin*, 429 N.W.2d 189, 194 (Mich. Ct. App. 1988), *rev'd on other grounds*, 438 N.W.2d 247 (Mich. 1989).

Another judge in this district has articulated the limited public figure test as follows:

> In order to establish that Plaintiff is a limited purpose public figure, Defendants must show that Plaintiff has:
>
> (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of the litigation;
>
> (2) voluntarily injected himself into a public controversy related to the subject of the litigation;
>
> (3) assumed a position of prominence in the public controversy; and
>
> (4) maintained regular and continuing access to the media.

*Nehls v. Hillsdale College,* 178 F. Supp. 2d 771, 778 (E.D. Mich. 2001) (Friedman, J.) (citing *Pesta v. CBS, Inc.*, 686 F.Supp. 166, 169 (E.D. Mich.1988)).

The Michigan Court of Appeals has held that, "on summary judgment motions involving alleged libel of public officials or public figures by the media, if any benefit of

9

the doubt is to be given, it must go to the media under First Amendment constitutional rights of free speech and free press." *Lins v. Evening News Ass'n,* 342 N.W.2d 573, 577 (Mich. Ct. App. 1983). This is because "[t]he federal cases make it clear that the chilling effects on the exercise of First Amendment rights of encouraging full scale state libel trials by public officials or 'limited' public figures will not be permitted. While this factor is not decisive, it must be kept firmly in mind in assessing matters such as burden of proof." *Id.*

Here, the court finds that Lynch is a limited purpose public figure with respect to the public controversy of societal views on funerals, cremations, and the legal requirements regarding funerals and burial. Lynch has been active in the funeral industry for at least 35 years. (FEO's Mot. For Summ. J. Ex. C.) He has written and spoken extensively about the effects of cemetery and mortuary protocols on the relationship between the living and the dead. *Id.* Lynch has authored six books, including *Skating with Heather Grace*, *Gimalkin and Other Poems*, *The Undertaking*, *Bodies in Motion and at Rest*, *Still Life in Milford*, and *Booking Passage*. (Lynch Dep. at 73.) His book, *The Undertaking,* won the American Book Award, the Hartland Prize for Non Fiction, an award from the "Irish American Attorneys Association,"[4] and it was a finalist for the National Book Award. (*Id.*) *The Undertaking* has been translated into six languages, and was the subject of a PBS Frontline documentary of the same title. (*Id.* at 74, 76.) The PBS documentary was largely filmed at Lynch's funeral home, operated

---

[4]Lynch referred in his deposition to the "Irish American Attorneys Association," but he likely meant the Incorporated Society of Irish American Attorneys.

10

by Lynch and Co., and his siblings funeral home in Clawson, Michigan. (FEO's Mot. at ¶ 10; Lynch Dep. at 156-158.)

Lynch has also appeared on a PBS series entitled *On Our Own Terms*, with Bill Moyers, the *Today Show*, and C-Span. (*Id.* at 77-79.) He has given interviews and commentaries which have been aired on National Public Radio ("NPR") and the British Broadcasting Channel ("BBC"). (*Id.* at 79.) He has written "dozens" of newspaper articles for such newspapers as the New York Times, Washington Post, Boston Globe, Los Angelos Times, as well as many other newspapers. (*Id.* at 78.) Lynch also serves on the State Board in Mortuary Science by appointment from the Governor of Michigan. (FEO's Mot. For Summ. J. Ex. C.)

Simply stated, Lynch has enjoyed a very successful and prominent career in more than one field. At the intersection of his two primary career choices, funerals and writing, Lynch appears to be as public a figure as the field has to offer. He has successfully invited public attention to his views in an effort to influence others, voluntarily injected himself into the public debate of funeral care, assumed a position of prominence in the funeral field, and he maintains regular and continuing access to the media. *Nehls,* 178 F. Supp. 2d at 778. The court's conclusion is based on the manner in which Lynch has propelled himself into the public discussion of after-life care by "invit[ing] attention and comment and . . . by taking affirmative steps to attract attention when he consented to television as well as to newspaper interviews. Thereby, he thrust himself 'to the forefront of (a) particular public controvers(y) in order to influence the resolution of the issues involved.'" *Hayes v. Booth Newspapers, Inc.,* 295 N.W.2d 858, 865-66 (Mich. Ct. App. 1980) (citing *Gertz,* 418 U.S. at 345, *Time, Inc. v. Firestone*, 424

U.S. 448, 453 (1976)). As a result, Lynch is a limited purpose public figure for the purposes of this suit.

Further, Lynch & Co. is a limited public figure to the extent that Lynch himself is. Businesses, just like individuals, can become a limited purpose public figure. In *Lakeshore Community Hospital., Inc. v. Perry,* 538 N.W.2d 24 (Mich. Ct. App. 1995), a hospital filed a tortious interference suit against an individual who opposed a merger the hospital was seeking. The Michigan Court of Appeals held that the plaintiff hospital was a limited purpose public figure for purposes of the suit because it was a long established business, was the only hospital in the area that provided obstetric and acute care services, and was a "prominent and critical component of the health care delivery system in the community, whose presence and operation directly affect the community." *Id.* at 28.

Lynch & Co. fills a community niche much like the hospital in *Lakeshore*. Although Lynch & Co. may operate in a small town in Michigan, the company has gained national attention through the efforts of one of its two members, Thomas Lynch. Not only was the business featured on the PBS documentary, *The Undertaker*, but Lynch testified at his deposition that there is no difference between himself and Lynch & Co. for purposes of the allegations in this lawsuit. (Lynch Dep. at 110, FEO's Ex. F.) He claims that references to the "Lynches" are simultaneously references to Lynch & Co. For this reason, to the extent Thomas Lynch inserts himself into the public arena to discuss or write about funeral care, he necessarily carries with him Lynch & Co.[5] As a

---

[5]Likewise, the court rejects Defendants' arguments that Lynch & Co. is not a proper plaintiff in this action. A rational finder of fact could reasonably find that the

12

result, Lynch and Co. is also a limited purpose public figure for the purposes of this suit. Because of the limited purpose public figure standard announced in *Gertz*, both Lynch and Lynch & Co. must show malice by clear and convincing evidence in order to succeed in this defamation action.

### B. MALICE ANALYSIS

If the plaintiff is a public official or a public figure, the First Amendment requires the plaintiff to prove that the defendant's statements are false and that the defendant acted with actual malice. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80, (1964). A defendant acts with "actual malice" where the defendant knew the allegedly defamatory statement was false, or acted "with reckless disregard of whether it was false or not." *Sullivan*, 376 U.S. at 280. "It also is worth emphasizing that the actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term." *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 666-67 (1989). The Supreme Court has stated that reckless disregard in this context means that the defendant must have published the material with a high degree of awareness of probable falsity or entertained serious doubts about the truth of the publication. *Id.* Preconceived objectives or insufficient investigation do not constitute reckless disregard. *Ireland v. Edwards*, 584 N.W.2d 632, 640 (Mich. Ct. App. 1998) (quoting *Grebner v. Runyon*, 347 N.W.2d 741 (Mich. Ct. App. 1984)). "[A] public figure plaintiff must prove more than an extreme departure from professional standards and that a newspaper's motive in publishing a story-whether to promote an opponent's

---

alleged defamatory statements are directed at both Lynch and Lynch & Co.

candidacy or to increase its circulation-cannot provide a sufficient basis for finding actual malice." *Harte-Hanks Communications, Inc.,* 491 U.S. at 665.

In *Harte-Hanks* the Supreme Court held that the evidence supported a finding of malice where the evidence revealed that a "newspaper's inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of [the published statements.] Although failure to investigate will not alone support a finding of actual malice the purposeful avoidance of the truth is in a different category." *Id.* at 692. However, instances of shoddy reporting alone do not constitute malice. *See, e.g., Faxon v. Michigan Republican State Central Committee*, 624 N.W.2d 509, 512-13 (Mich. Ct. App. 2001) (holding that despite the author's failure to verify the accuracy of their sources, an inaccurate campaign brochure stating that a candidate inappropriately used legislative immunity to avoid a lawsuit after selling an imposter Ming vase did not constitute malice because the authors of the brochure based their belief on other published news articles); *Battaglieri v. Mackinac Center For Public Policy*, 680 N.W.2d 915, 922 (Mich. Ct. App., 2004) (holding that a think-tank pamphlet which contained an out of context, yet accurate, statement by an adversary did not exhibit malice despite the fact that the statement could have placed the adversary in a false light); *Collins v. Detroit Free Press, Inc.,* 627 N.W.2d 5, 10 (Mich. Ct. App., 2001) (holding that even a purposeful alteration of a statement would not constitute malice if the alteration is not "material").

Here, Plaintiffs are unable meet their evidentiary burden to show that any of the Defendants either knew the material they published was false or exhibited reckless disregard for the truth of the statements.

What Plaintiffs have demonstrated is that the two parties are on opposite sides of a public discussion regarding the proper latitude families should be given when a loved one dies. That Plaintiffs may argue that they were dragged into this discussion does not negate the undisputed fact that the parties are in a public dispute revolving around after-life care, the area in which Plaintiffs operate as limited public figures.[6] In their response to FEO's Motion for Summary Judgment, Plaintiffs list several instances that they claim establish that FEO and Carlson acted with malice. While circumstantial evidence can prove malice, *Hodgins v. The Times Herald Company*, 425 N.W.2d 522, 528 (Mich. Ct. App. 1988) (citing *Steadman v. Lapensohn*, 288 N.W.2d 580 (1980), *rehearing denied* 408 Mich. 1109 (1980)), here the proffered examples fall short of showing that any of the Defendants had the requisite mental state to achieve malice. The evidence Lynch presents is:

(1)  The quote "The guy's a snake." (Pls.' FEO Resp., Ex. C.)

(2)  The quote "his words will come back to haunt him in writing." (*Id.*)

(3)  In "Caring for the Dead: Your Final Act of Love" Lisa Carlson accused Lynch of falsely claiming that medical schools were not in need of

---

[6]Indeed, the record before the court suggests that the "debate" between the parties has been instigated primarily by Defendants, particularly Lisa Carlson. Her numerous, tendentious commentaries could easily be viewed as not much more than attempts to use Lynch's renown to launch herself, and her agenda, into a limelight to which she would not otherwise have much access. Lynch, on the other hand, seems to have exercised a fair amount of restraint, largely avoiding the irritation presented by Defendants' efforts.

cadavers, freeing up more bodies for funerals. (Pls.' Resp. To FEO's Mot. For Summ. J. at 12.)[7]

(4) The quote found in Carlson's review of "The Undertaking": "In the program, the Lynches appear to have ignored the Rule breaking the law in the their dealings with at least three families." (Pls.' FEO Resp., Ex. G.)[8]

(5) The fact that FEO mentions only his funeral practice, and no other Michigan funeral practices, in the Spring-Summer 2008 newsletter. (Pls.' FEO's Resp. at 12.)

(6) Plaintiffs' allegation that Carlson decided to wait a while before putting up a retraction so that subscribers could see the defamatory material first. (Pls.' FEO Resp. Ex. N.) [9]

---

[7]According to Carlson's investigations which she details on the same page, this is true. All of the medical schools in the state of Michigan do need bodies to one degree or another. (Pls.' Resp. To FEO's Mot. For Summ. J. Ex. D.) Plaintiffs have offered no evidence that Carlson's assertions regarding the need for cadavers are false.

[8]Lynch agrees that there is no *depiction* of a mandated price list provided to customers in the final version of the documentary. (Carlson's Mot. For Summ. J. Ex. B at 155.)

[9]When read in context, the court attributes a different meaning to Carlson's statement than that suggested by Lynch. When Carlson speaks of "putting it up" she is referring to posting a public link to the most recent newsletter. It appears to the court that Carlson is delaying posting the link because she wants subscribers to have access to the newsletter before the general public, not, as Lynch suggests, because she wants to let the libelous material linger so that it can have a fuller effect. Lynch's assertion that Carlson is delaying posting a retraction is also doubtful because in the same draft Carlson states that "I see no need to retract any statements made in the newsletter". (Pls.' FEO Resp. Ex. N.)

    (7)    An email from one of FEO's board members that states "I think it is wrong what you are doing - at this point you seem to be creating a personal argument."  (Pls.' FEO Resp., Ex. O.)

The evidence shows that Carlson called Lynch a snake, spoke only of his practice and no others in the FEO article, received an email from a board member who believed the argument was becoming personal, and made various other statements regarding her dislike of or disagreement with Plaintiffs.  The evidence provided by Plaintiffs establish that the parties are on opposing sides of a hotly, though perhaps not widely, contested political issue and that the debate is becoming increasingly malevolent.  This is precisely the sort of ill will that is insufficient to constitute "actual malice."  *Ireland*, 584 N.W.2d at 640 ("Ill will, spite, or hatred standing alone do not constitute actual malice").  Indeed, "'[a]ctual malice' here means knowledge of the falsity of the published statements or reckless indifference as to whether they were true or false. Actual malice is to be distinguished from a bad or corrupt motive or some personal spite or desire to injure the plaintiff."  *Hayes v. Booth Newspapers, Inc.,* 295 N.W.2d 858, 866 (Mich. Ct. App.1980) (citing *Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 82 (1967).

None of the evidence presented by Plaintiffs exhibits a reckless disregard for the truth or knowledge that statements were false.  In fact, many of the statements alleged to support a finding of malice appear, based on the record before the court, to be true, and certainly Defendants have not produced evidence that shows them to be patently false.

Even if Plaintiffs had shown the statements were false, they still cannot show actual malice based on the evidence before the court. A defendant acts with "actual malice" only where the defendant knew the allegedly defamatory statement was false, or acted "with reckless disregard of whether it was false or not." *Sullivan*, 376 U.S. at 280. Plaintiffs, however, have not deposed Carlson or any representatives of FEO or FCA and are unable to offer any evidence as to their state of knowledge of the statements, or their alleged reckless disregard of the falsity of those statements.

Because Lynch and Lynch and Co. are both limited purpose public figures, they must provide evidence such that a rational finder of fact could find actual malice by clear and convincing evidence. *Anderson*, 477 U.S. at 254 (1986). Here, neither Plaintiff has done so. The evidence offered by Lynch proves that there is a vigorous public debate and some degree of ill will. Nonetheless, there is no evidence on which a rational jury could find actual malice. Defendants are therefore entitled to summary judgment on all four counts of the complaint.[10]

---

[10] Even if the court had not granted summary judgment on the lack proof of actual malice, Defendants would nonetheless be entitled to summary judgment on at least some of the other grounds raised by Defendants in their briefs. For example, the statement involving what "appears" to occur on the documentary appears to be either provably true or statement of Carlson's opinion in reviewing the documentary. Moreover, the court is inclined to find that Plaintiffs could not prove damages if this case proceeded to trial. Plaintiffs have foregone any expert testimony on the issue and at his deposition, Lynch admitted that he could not say if a downturn in business related to the alleged defamatory material. (Lynch Dep. at 276, FEO's Mot. Ex. F.) While his subsequently signed affidavit attempts to assert, in a rather conclusory manner, that his loss in profits "may be attributed" to the challenged statements, this half-hearted assertion could not be used to contradict his earlier sworn statement. A party may not create a genuine issue of material fact by filing an affidavit that "essentially contradicts his previous deposition testimony" after a motion for summary judgment has been filed. *Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997).

## V. CONCLUSION

IT IS ORDERED Defendants' motions for summary judgment [Dkt. ## 41,45,47] are GRANTED.

      S/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated: July 31, 2009

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, July 31, 2009, by electronic and/or ordinary mail.

      S/Lisa G. Wagner
Case Manager and Deputy Clerk
(313) 234-5522